Proseus *v.* McIntyre.

---

MONROE GENERAL TERM, January, 1849. *Johnson, Welles, and Selden,* Justices.

Proseus v. McIntyre.

In such cases the question is one of intention entirely. *Per* WELLES, J.

Voluntary conveyances are effectual as between the parties, and cannot be set aside by the grantor, although he afterwards becomes dissatisfied with the transaction.

Where land is purchased by a father, and paid for by him, but the conveyance is made to his son, by the direction of the father, for the purpose of defrauding the creditors of the latter, no trust will result in favor of the father in consequence of his having paid the consideration money; but as between the father and son and those claiming under the father, such conveyance is absolute, and vests in the son the entire legal and equitable estate.

But the fact that the father, in such a case, paid the whole purchase money of the land, forms a good moral or conscientious consideration for a parol agreement, subsequently made, between the father and the grantee, and another son, for the division of the land between the two sons. And after the two sons have acted under such agreement, for several years, and recognized each other's interests in the respective parcels, and expenditures have been incurred in consequence of such agreement and division, and upon the faith of it, the grantee in the original conveyance will not be allowed to repudiate such agreement, and to claim the whole premises by virtue of his deed.

IN EQUITY. The bill in this cause was filed on the 28th of April, 1840, by John Proseus, who was then alive, to compel a conveyance by the defendant of the east half of the north half of lot number three in second range of lots in township number fourteen in the first range of towns in the county of Wayne, the whole lot number three containing about three hundred and twenty-four acres. The answer of the defendant was put in on the first of February, 1841, to which a general replication was filed on the 9th of the same month. Afterwards, and before any further proceedings were had in the cause, John Proseus died. On the 4th Monday in July, 1843, by an order of the court of chancery, the suit was revived in the names of Ira Proseus and Anson Proseus, administrators of, &c. of John Proseus, deceased, with the will annexed. Proofs were then taken in the cause, for the plaintiffs and defendant, and on the 22d day of June, 1847, the proofs were closed. The cause was noticed for hearing at a special term of this court held in Monroe county on the 3d day of January, 1848, at which term the hearing was ordered to be had at a general term. The hearing was brought on at a general term held in Cayuga county on the 3d Monday of January, 1848.

Upon the argument the court held that the cause had not been revived in the name of the proper parties, and an order was entered that the plaintiffs have leave to file a bill of revivor and supplement in the names of the present plaintiffs, and that the proofs taken be read upon the final hearing. The bill of revivor and supplement was accordingly filed on the 11th of March, 1848, and an order was entered on the 10th day of July, 1848, taking the last mentioned bill as confessed.

The facts will sufficiently appear in the opinion of the court.

*Lyman Sherwood*, for the plaintiffs.

*W. H. Adams*, for the defendant.

*By the Court*, Welles, J. The facts, as I regard them, established by the pleadings and proofs, are substantially as follows: On or about the 19th day of May, 1817, Sanford Williams and wife, by deed of that date, conveyed to the defendant, who was then a minor under the age of twenty-one years, the north half of said lot number three, including the premises in question, for the consideration of $815. The purchase of this land of Williams was made by William McIntyre, the father of the defendant, and the consideration or purchase money paid to Williams by said William McIntvre. At the time of such purchase and conveyance, William McIntyre was considerably embarrassed with debts incurred principally by becoming security for other persons, and the deed was made to the defendant, his son, by directions of the father, in order to prevent its being made liable to his debts. At the time of the purchase from Williams, William McIntyre lived on a farm in the town of Seneca, Ontario county. Afterwards he removed with his family to a farm in Sodus, Wayne county, about three miles from the land bought of Williams, and resided there until his death, which took place about May, 1836. The farm in Sodus, of which he was in possession when he died, he held under a contract of purchase from John Greig. It was called the homestead farm. On or about the 25th day of August,

1823, said William McIntyre obtained a loan of $230 from the commissioners of loans of Ontario county, to secure which, the defendant gave a mortgage upon the west half of the land purchased of Sanford Williams. Sometime afterwards and after William McIntyre had removed to the town of Sodus with his family, and while they were living upon the premises purchased of Greig, before the defendant was married and while he was living with his father, a verbal arrangement was entered into between William McIntyre the father and his sons, the defendant and John R. McIntyre, to the effect that the defendant should have the west half, and John R. the east half; and that John should pay the mortgage of $230 to the commissioners of loans, whenever it should be called for, and pay the interest annually in the meantime. That the defendant should have from the property of the said William McIntyre a yoke of oxen, a yoke, chain, plough and drag, one or two cows, half a dozen sheep, three or four hogs, and provender for the same for a year, and his store bill was to be paid for him for one year. Upon John's paying off the mortgage to the loan commissioners, the defendant was to convey him the east half of the land, being the premises in question. In pursuance of that agreement, the defendant shortly afterwards went into actual possession of the west half, built a house upon it, and has continued to reside upon it ever since. At the time he went on, the personal property, the oxen, &c. which, by the arrangement, he was to have, were furnished him from the farm of his father. The defendant employed a surveyor to run a division line north and south through the land bought of Williams, dividing it equally; he paying one half of the expense of the survey, and John the other half; the defendant, from that time recognizing the line so run as the division line between him and his brother John, and occupying up to it. After the defendant moved on to the west half of the land purchased of Sanford Williams as aforesaid, John R. McIntyre took possession of the east half, built a log house on it worth fifty dollars, and made other improvements thereon, and occupied it by a tenant for some time, and until the 22d of February, 1834, when he

contracted in writing to sell it to John Proseus, the original plaintiff in this suit. By the contract between John R. McIntyre and Proseus, the latter was to pay for the land the sum of $8 per acre, with interest upon what should remain due from the 15th day of April following the date of the contract, as follows: $50 by the 10th day of March next, after the date of the contract; $100 and interest on the same, by the first day of October then next; the residue of what the land should amount to, in four equal annual instalments, with interest on each instalment, to commence one year from the 1st day of October then next, and Proseus to pay all taxes, &c. and to be at liberty to go into possession at any time he chose, and to remain in possession until he should make default in paying, &c. The tenant whom John R. had on the premises, at the time he sold to Proseus, was in under a contract for five years, and was paid $40 to give up possession to Proseus. Soon after the execution of the contract of sale with Proseus, and in the spring of 1834, Henry Proseus, the son of John Proseus, went into possession of the east half, &c. under his father John Proseus, and has continued so in possession under his father, ever since. John Proseus paid, on account of the purchase money, on the date of the contract, $20; on the 10th of March, $30; on the 26th November, 1834, $60; on the 3d January, 1835, $40 principal, and $4,25 interest; October 28th 1835, $50; March 17th, 1836, $33; May 26th, 1836, $22,25; November 16th, 1836, $150; and May 31st, 1838, $100. The defendant knew of the sale by John to Proseus after it was made, and was present when the $100 was paid by the latter to the former on the contract, on the 31st of May, 1838. John R. McIntyre paid up the interest on the mortgage regularly until May, 1838.

In the month of March, 1839, the defendant obtained a loan of $500, by mortgaging the west half of the premises, out of which he paid the mortgage of $230, amounting, at the time of such payment, with interest, to $244,30, the payment of the principal of such mortgage not having been called for. In January, 1840, the defendant commenced an action of eject-

ment to recover possession of the east half, against Henry Proseus, who was in possession under his father John Proseus, whereupon the bill in this cause was filed and a temporary injunction issued to restrain the defendant from proceeding in the ejectment suit until the further order of the court, &c. Shortly previous to the commencement of the ejectment suit, Henry Proseus, in behalf of his father, offered to pay the defendant the amount he had paid to remove the mortgage to the loan office, with interest, which the defendant refused to receive. The defendant, after the arrangement between his father and his brother John, in regard to the land purchased of Sanford Williams, repeatedly and at various times, declared to various persons that the west half belonged to him, and the east half to his brother John; and said to one witness, after John had sold to Proseus, and who he was letting have some wood from the land, that he must not go farther east than the line, pointing out to him the line which had been run, and saying to him " all east of that line we have sold to Mr. Proseus."

It would seem that the defendant never contemplated holding the east half of this land, until after his father's death; and there does not appear in the evidence any justifiable motive for his discharging the loan office mortgage, the interest of which his brother John had regularly kept paid up, and the loan was a permanent one, and the principal had not been called for. If it was for an investment of his money, and he was willing to become the creditor in place of the commissioners of loans, it would all have been well enough, provided he had been willing to give the same credit as could have been obtained from the loan commissioners. But it seems to me that neither John nor Proseus could be regarded as in default, so long as the interest was punctually paid, until after the loan commissioners had called for the principal. The particulars of the arrangement between William McIntyre and his two sons John and Samuel is proved by Hugh McIntyre, the brother of William. He swears the arrangement took place in his presence, between the three parties to it, at William McIntyre's, in Sodus, Wayne county, in February, 1829 or 1830, and when the defendant

Proseus *v.* McIntyre.

and his brother John were living at home with their father, William McIntyre, and when they were both single men. Hugh also testifies that he was at his brother William McIntyre's the last three days of his life, at which time he asked the witness if he recollected the conversation before had respecting the division of the Williams lot between the boys. That witness told him he did ; that his brother went on and repeated it, and told the witness he wished him to remember it. He thought he should live but a few days, and thought there might be trouble about it. That his brother died the next day. The testimony of this witness is assailed in two ways. First, by contradicting him. The testimony on the part of the defendant shows that in 1829, Samuel was a married man, and that his marriage took place probably in January, 1828. If this was so, then Hugh is mistaken in the time of the first conversation, by one or two years, or in the fact which he states that Samuel was then a single man. I do not think this is a circumstance which, taken alone, amounts to any thing. He was testifying, in July, 1844, in relation to a conversation which took place, if at all, some 16 or 17 years before, and it would be somewhat remarkable if, without having made a memorandum of the time, or having any fixed date to connect it with, he should have been entirely accurate as to the time. It is rarely that men can, without some aid, and from mere memory, preserve greater accuracy in dates.

Evidence was also given to show that William McIntyre, during the last three days of his last sickness, was insensible and incapable of conversing intelligibly on any subject. On this point it is to be remarked that it sufficiently appears that the witness Hugh, his brother, was with him during the last three days of his life. That he was with him more than any other person, and that it appears by some of the witnesses that William McIntyre did converse some, and knew the persons attending upon him. The witnesses who testify against his capacity, give their opinions merely as to the state of his mind, which is at all times the most unreliable evidence on such a question, unless by a medical witness. Besides, there is not on

Proseus *v.* McIntyre.

this subject a uniformity of opinion among the witnesses.   On the supposition that Hugh is correct in his account of the first conversation, it is not at all improbable that his brother, in view of his approaching death, should have adverted to the subject; and he would be more likely, in all probability, to speak of it to his brother Hugh than to any one else.

Second; the testimony of Hugh McIntyre is assailed by an attempt to show that his character is so bad as to render him unworthy of credit.   This attempt, I think, has not succeeded. Some impression is indeed made upon his character, and I am not prepared to say it stands as fair as if it had not been attacked.   Nevertheless it is not to be disguised that his bad character is confined to a comparatively small circle, and seems to be connected with a business difficulty he had some years ago, with one or more of the individuals of that circle.   He was a man 52 years of age, and was quite extensively known in Ontario and Wayne counties, in both of which he had lived many years, and quite a number of witnesses, especially in Ontario county, where he had spent the most of his life, and where he had resided several years next before his examination, gave him a fair character.

If the case rested upon the testimony of Hugh alone, it would not be sufficient to found a decree upon; because the agreement which he swears to is denied in that part of the answer which is responsive to the bill, and which answer is put in under oath, in pursuance of a prayer of the bill that the defendant should so answer.   But his testimony is so strongly corroborated in all its parts, as to leave no doubt, upon my mind, of its truth.   Evidence from a large number of other witnesses cumulate, in a remarkable degree, to fortify and corroborate his statements.   All the acts and declarations of the defendant, from the purchase of the land from Williams, by his father, until after the death of the latter, and until shortly before the commencement of the action of ejectment, are entirely consistent with the view presented by the bill, and are irreconcilable with any other.   I have, therefore, no difficulty in coming to the conclusion that, in point of fact, the case

made by the bill is substantially sustained by the evidence in the cause.

It abundantly appears that this land was purchased of Sanford Williams by William McIntyre, the defendant's father, and paid for by him, and that the deed was made to the defendant as grantee, by his father's directions, for the reason that the father was embarrassed with debts, and for the purpose of preventing the land from becoming liable for those debts. That the father kept the deed in his possession and controlled the land, until about the time the defendant went into possession of the west half, a period of nine or ten years, when, as the defendant says in his answer, he took possession of the deed from his father's drawer, where it had been kept among his other papers.

Upon the naked fact, that a father buys and pays for land and has the deed made to an infant child, the inference of law is that it is an advancement to the child and not a resulting trust to the father. But it is always competent to meet and repel such inference, by proof that the father did not intend it as an advancement. In such cases, the question is one of intention entirely. In the present case, there is nothing to show that William McIntyre, the father, intended this land as an advancement to his son Samuel, excepting the mere facts that the deed was made to him, and that he was a minor at the time. Those facts, and the inference claimed to arise from them, are, I think, satisfactorily met and explained. At the time the purchase was made a different reason was assigned by the father. It is proved that about that time he was embarrassed with debts and his property sold on executions. Then all the subsequent declarations and transactions of the defendant and his father and of John R. McIntyre, under whom the plaintiffs claim, completely contradict the idea that the deed had been taken in the defendant's name for his sole benefit, or as an advancement to him alone.

If the land was not intended as an advancement to the defendant, a resulting trust would have been created in favor of William McIntyre the father, excepting for the considerations

hereinafter mentioned.   As the law now stands, under the re-
vised statutes, there would be no resulting trust in favor of the
person paying the money.   (1 *R. S.* 722, § 51.)   But the trans-
action took place, and the rights of William McIntyre and his
two sons Samuel and John became vested long before the re-
vised statutes took effect, and the case must be governed by
the law as it stood before.   It may be questionable whether
this conveyance from Sanford Williams to the defendant was not
void as against the creditors of William McIntyre, it having
been made, as the proof shows, by his directions, to the defen-
dant, with the express intent of keeping it beyond the reach of
such creditors; and if void as to them, whether William Mc-
Intyre or those claiming under him can set up a resulting trust
as against the defendant.

The rule in regard to voluntary conveyances is that they are
effectual as between the parties, and cannot be set aside by the
grantor, although he afterwards becomes dissatisfied with the
transaction.   (1 *Story's Eq. Jur.* § 371.)

In regard to the question whether, in order to make a con-
veyance void as against creditors, it is indispensable that it
should make a transfer of property which could be taken in ex-
ecution by the creditors, or compulsorily applied to the debts of
the grantor; or whether the rule equally applies to the convey-
ance of any property whatsoever, of the grantor, although not
directly so applicable to the discharge of debts, is one which
has given rise to some diversity of judicial opinion.

The English doctrine upon the subject seems to be in favor
of the former proposition; namely, that in order to make a vol-
untary conveyance void as to creditors, it is indispensable that
it should transfer property which would be liable to be taken
in execution for the payment of the debts, for the reason that
such conveyance could not be injurious to creditors, because it
would not withdraw any fund from their power which the law
had not already withdrawn from it.   (*Story's Eq. Jur.* § 367,
*and cases there cited.*)

In the case of *Bayard and others* v. *Hoffman and others,*
(4 *John. Ch. Rep.* 45,) Chancellor Kent held a different doc-

Proseus *v.* McIntyre.

trine, and decided that a voluntary settlement, either of lands or chattels, by a person indebted at the time, is void as against creditors. In that case, the property assigned, and as to which the assignment was held to be void as against creditors, was stock of the United States; an article which, by the common law, could not be taken in execution. The decision was put upon the ground that although choses in action may not in the first instance be levied upon by virtue of an execution at law, yet by the aid of a court of equity, they may be made subject to the payment of the judgment. I prefer to follow the case of *Bayard* v. *Hoffman*, as it seems to me supported by the better reasoning, and is based upon a wholesome public policy, and sound legal morality.

But this case, I think, may be easily and safely decided upon its own intrinsic circumstances, and without holding that a trust resulted to William McIntyre, in consequence of his paying the consideration money. If it were necessary to hold that a trust resulted to William McIntyre, I do not see how the plaintiff could get along without making the rest of the children of William McIntyre the father, parties. There is one other son besides Samuel and John, and four married daughters. Before the Williams premises could be definitely disposed of between Samuel and John, and John's vendees, by a decree of this court, the other children should be made parties if there was a resulting trust to William, the father. If by the deed from Williams to Samuel, the latter became vested with the absolute fee as against his father and those claiming under him, it is a question between the parties to this suit and John R. McIntyre only, the latter of whom should have been made a party. And no decree can be made until that is done; unless the difficulty can be obviated, as hereinafter mentioned.

I am of the opinion therefore, that no trust resulted in favor of William McIntyre the father upon the conveyance by Sanford Williams to Samuel McIntyre, in consequence of the former having paid the consideration money; for the reason that the conveyance was made to Samuel by direction of his father, with a view to defraud his creditors; and that as be-

tween Samuel and William and those claiming under him, the conveyance was absolute, and vested in William the entire legal and equitable estate.

The fact that William McIntyre paid the whole purchase money formed a good moral or conscientious consideration or inducement for the parol arrangement proved, in regard to the disposition and division of the land to and between the defendant and his brother John R. McIntyre; and inasmuch as the parties have acted under it for a series of years, and as considerable expenditures have been incurred in consequence and upon the faith of it, and important rights have become vested under it, it would be inequitable and unconscionable to allow the defendant to break it all up; especially when it appears that the other parties interested are not in any respect in default.

I think, therefore, that the defendant is not entitled to hold the east part or half of the land in question. But I think that John R. McIntyre should have been made a party to the bill, either as plaintiff or defendant. He has a right to be heard before the defendant shall convey the land in question to another person, which he has sold by contract. He has an interest in the question whether the purchase money has been paid by Proseus, and I do not see how a decree can be made without his being brought before the court. In no event, can a decree be made for a deed from the defendant, excepting on payment to him of the amount he has paid to discharge the loan office mortgage, with interest thereon.

Another question of no small embarrassment to me, is as to whom the conveyance shall be made by the defendant, in case the foregoing difficulty in relation to parties, can be obviated.

John Proseus is dead. He left a will by which he gave to his wife, in case she survived him, the control of his real and personal estate during her life, with the right to dispose of the same excepting a certain 90 acres where he resided, as she might deem proper in order to pay claims against his estate and to support the family. After his wife's death, the 90 acres were

to go to his sons Anson, Jonas and Ira, subject to and upon condition of their paying certain legacies to his other children and grandchildren, and in case they should decline taking it upon those conditions, or should neglect paying the legacies as directed, then his executors were to sell the 90 acres and divide the proceeds among his children and grandchildren in certain proportions specified in the will. And in case his wife should not sell the McIntyre lot, (the premises in question in this suit,) his executors were to sell his interest in the same after his wife's death and to pay out the proceeds in the manner directed in the will. The testator also grants to his wife full powers of substitution during her life, in all matters of real and personal estate excepting the power of disposing of the above mentioned 90 acres of land. The executors named in the will have renounced, and letters of administration have been issued by the surrogate of Wayne county to Ira Proseus and Anson Proseus, as administrators, &c. with the will annexed. Hannah Proseus, the widow, has since, by an instrument under seal, duly executed and acknowledged, released to the administrators all her right, interest and claim under the will, and all her right, interest and claim in the real and personal estate of the said John Proseus, deceased, and all claim of dower in his real estate; and by the same instrument vesting in the administrators all the power they would have in relation to the real and personal estate under the will in case of her death.

Upon the whole I incline to think that in case a conveyance shall be made by the defendant to carry out the covenants of John McIntyre, made with John Proseus in his lifetime, in relation to the land in question, it should be made to Ira Proseus and Anson Proseus, as administrators of, &c. of John Proseus deceased, with the will of the deceased annexed, in trust to execute the provisions of the will, &c.; the form of the deed to be settled under the direction of one of the justices of this court, or a referee to be appointed, &c.

With respect to the difficulties suggested about parties, I am disposed, if it can be done, to relieve the plaintiffs from any further expense in the way of amendment of their bill in that

Proseus *v.* McIntyre.

respect.   If the plaintiffs will procure the said John R. McIntyre to come personally before the referee hereafter named, and consent in writing that a final decree be made in this cause, the same as if he had been made a party thereto, and waiving his right to be made such party, such consent to be under seal and to be acknowledged in like manner as conveyances of real estate are required to be acknowledged, and to be returned and filed as a part of the referee's report, in such event, that it be referred to George H. Middleton, Esq. county judge of Wayne county, to inquire and report how much has been paid to the said John R. McIntyre upon his contract with John Proseus, and how much remains due and unpaid, including interest, if any thing.   The referee also to ascertain and report what sum is due to the defendant on account of the payment by him to the commissioners of loans, in satisfaction of his mortgage to them, mentioned in the pleadings, including interest from the time of such payment to the date of the report.   But in case the plaintiffs shall fail to procure the consent before mentioned, to be executed, acknowledged and returned in the way suggested, the referee is to do nothing further under such reference than to report such failure.

The plaintiffs may at their election, take such an order as above directed, or an order that the cause stand over for the purpose of bringing in the said John R. McIntyre by an amended bill and process thereon, as a defendant in this suit.   All other questions to be reserved until after the referee's report.